A. HISTORY OF HARASSMENT, INITIAL COMPLAINT

On or about November 23, 2016, Officer Shannon Reeves of the New Orleans Police Department (NOPD) reported to NOPD Sergeant Walter Powers that she had been sexually harassed by Rhett Charles, also an officer with the NOPD. Sergeant Walter Powers informed Officer Reeves that he would consult with the Public Integrity Bureau and would subsequently follow up with her.

Prior to the report in November 2016, Officer Reeves had been experiencing harassment from Charles, her ranking officer, for several months. The first such incident occurred sometime during the first week of February 2016. During the lunch hour, when Officer Reeves' coworkers had gone to the lunch room and she was alone at her desk, Charles came and sat down beside her, and instructed her that he wished to ask her something, but that she should act, for the conversation, as though he were not her ranking officer.

Charles then asked Officer Reeves "how fat is your pussy?" Officer Reeves told him that she did not wish to engage in the discussion, but Charles asked again, telling her "I like a fat pussy." Charles then continued to tell Officer Reeves that, when he had worked with the Public Integrity Bureau, he "used to have sex in the bathroom with people all the time." Charles asked Officer Reeves what her favorite sexual position was; what was the "freakiest" sexual thing she had ever done; and whether she had ever had sex while on her period.

Charles then told Officer Reeves that he knew she lived close to him, and said "I purposely take off during the week while my wife is at work. So whenever you want to come over let me know because I just walk around the house naked and laying in the bed stroking myself." At this point in the conversation, one of Officer Reeves' coworkers entered the room, and Charles hurriedly changed the subject.

Later that same day, as Officer Reeves was leaving work, Charles told her loudly from across the room "Shannon, we are going to finish having that conversation." Officer Reeves responded "I don't think so" before leaving for the day.

Officer Reeves suffered from continuous anxiety and migraine headaches following the February incident. Then in March 2016, Charles approached Officer Reeves from behind, put his right arm around her, and shook her from the side, looking down her shirt. When Officer Reeves asked him why he was shaking her, he responded, "I just wanted to see how my friends were doing."

In June 2016, Charles called Officer Reeves into his office, after noticing her through his open office door. He told her "all I see is titties when I look out my door at you." Charles went on to tell

Officer Reeves that "[i]f we ever have sex, I'm going straight for the titties, I don't have to do nothing else. I can make you nut just by sucking on your nipples." Charles then asked her how big her nipples were, opining that Officer Reeves must have big nipples. When Officer Reeves began walking out the door, Charles said "bye y'all" (referencing Officer Reeves' breasts).

On July 2, 2016, Charles called Officer Reeves into his office. After Officer Reeves came in, Charles said "I just wanted to see y'all walk in." Presumably noticing the look of disgust on Officer Reeves' face, Charles then said "oh, I was just playing."

After making the report to Sergeant Walter Powers on November 23, 2016, although Sergeant Powers had stated that he would follow up with her, Officer Reeves did not receive any further communication from Sergeant Powers. Therefore, on December 1, 2016, Officer Reeves requested a meeting with Ms. Ursula Price (police monitor). Officer Reeves informed Ms. Price of the sexual harassment that she had been experiencing from Charles.

During the meeting with Ms. Price, Officer Reeves played an audio recording of a conversation between Officer Reeves and Charles. On that recording, Charles is speaking to Officer Reeves about her breasts, part of the conversation that occurred in June 2016, as described above.

After the meeting, Ms. Price contacted PIB, who assigned Sergeant Christopher Johnson to the case. On December 6, 2016, Sergeant Johnson came to NOPD headquarters and met individually with each person assigned to morning watch, which included Officer Reeves.

During the meeting with Sergeant Johnson, Officer Reeves again reported the incidents of harassment by Charles. Officer Reeves also informed Sergeant Johnson that she had an audio recording of a conversation with Charles; the following day, Officer Reeves sent a copy of the recording to Sergeant Johnson.

Shortly after the reporting to Sergeant Walter Powers, Ms. Ursula Price, and Sergeant Christopher Johnson, Officer Reeves noticed a one-on-one meeting between Charles and Sergeant Powers in Powers' office. When Sergeant Powers looked up and made eye contact with Officer Reeves, Powers closed his office door.

B.  **RETALIATION**

Officer Reeves was retaliated against for engaging in protected activity (making a complaint of sexual harassment) in the following respects:

1. **Her employer failed to act on her complaint, not taking any action when she initially made the complaint, and not taking any action to protect her from her harasser, instead maintaining him as her as her supervising officer;**
2. **Her employer failed to keep her complaint confidential, so that extremely sensitive information was made available not only to her harasser, but to the department at large, such that she has been subject to constant taunting and/or harassment by other employees since the time of making the complaint;**
3. **Her employer failed to protect her private medical information, and subjected her to ridicule among other employees on the basis of her protected medical records;**
4. **Her employer transferred her to several different positions after making the complaint;**
5. **Her employer attempted to terminate her employment, due in part to her complaint of sexual harassment, but also due to her medical condition and restrictions;**
6. **Her employer has withheld her pay on multiple occasions, causing substantial financial difficulty for her;**
7. **On January 23, 2018, she discovered that her employer had reported to her pension plan that she had been terminated, effective in early 2015, and that her employer had failed to make regular payments to her pension plan since that time.**

**Her employer failed to act on her complaint; did not take any action when she initially made the complaint; did not take any action to protect her from her harasser, instead maintaining him as her as her supervising officer; failed to conduct the investigation in a reasonably timely fashion; and failed to issue an appropriate reprimand.**

Officer Reeves was informed by at other NOPD employee(s) that her complaint of sexual harassment had not been kept confidential.  Charles had been informed of the complaint, and also knew that Officer Reeves had turned over an audio recording to the investigators.  Charles told other people in the department that "the big-chested girl, Shannon Reeves, has a sexual harassment complaint against me."

Regardless of this lack of confidentiality, Charles was not transferred or reassigned pending the outcome of the investigation.  Charles remained Officer Reeves' ranking officer for over a month, until Officer Reeves was instead transferred.  Charles continued to work in a position supervising female officers.

Officer Reeves suffers from severe and debilitating migraine headaches, which can be triggered by fluorescent lights.  Her treating neurologist wrote a letter, advising that Officer Reeves was restricted from working under fluorescent lights due to her condition.  Although the accommodations for this restriction would have been as simple as replacing the light fixtures in Officer Reeves' working area, the department failed or refused to do so.

Instead, NOPD subjected Officer Reeves to a "Rule 9" hearing, in an attempt to terminate her employment, ostensibly because they could not accommodate the restriction as to the fluorescent lighting.  This was around the time of her submission of the complaint against Charles. They transferred her to different positions/units; they even transferred her out of a position which seemed to be helping her symptoms to improve.  After several transfers, in early 2017, Officer Reeves ended up back in the same position that she had occupied prior to making the complaint against Charles.

Prior to the Rule 9 hearing, Officer Reeves walked into the office of a senior NOPD staff member, and found that he was reading aloud from her medical records to several other staff members, while laughing and commenting on the information.  None of the people present were involved in any way with the Rule 9 hearing, nor was there any other reason that they should be privy to any of the information contained in Officer Reeves' medical records.

Officer Reeves' employer took a year to conduct an investigation as to Officer Reeves' complaint.  This time delay was retaliatory in and of itself, especially given the fact that Officer Reeves continued to be subjected to daily hostility throughout.  During the first month and a half of the

investigation, her employer failed to take any action to protect her; she was still forced to work each day under Charles, knowing that he had been informed that she had filed a complaint against him.

After that six weeks had passed, Officer Reeves wrote an email message to the department conducting the investigation, asserting that she did not feel comfortable with continuing working directly with Charles after filing her complaint and pending the outcome of the investigation. Afterward, finally, her employer transferred Charles so that Officer Reeves was no longer subject to his authority each day.

However, after conducting their investigation of Officer Reeves' complaint of sexual harassment, despite its clearly meritorious allegations (especially in the context of the fact that the employer had documented complaints of sexual harassment from at least 8 other women), the NOPD issued a one-day suspension as a reprimand. Charles was also demoted from the rank of Sergeant to Police Officer 4, which did not reduce his salary.

This action by the NOPD may fall into many categories, but it may hardly be said to be a reprimand; if anything, it serves only to boost Charles' celebrity status, while concomitantly having the implicit effect of encouragement of similar behavior and escalation of blatant hostility toward Officer Reeves. To illustrate the gross disproportion of this "reprimand" to Charles' behavior as a serial sexual harasser, one may consider the fact that, during the weeks leading up to the filing of this supplemental complaint, Charles has received not one, but two days of suspension (arguably twice the punishment meted out for his sexual harassment of Officer Reeves) for having been found culpable of improper processing of his police reports.

The implications of this differential are disheartening, to say the least; a powerful arm of local government chose to adjudicate clerical errors as though they are twice as abhorrent as a calculated pattern of aggressive sexual harassment. This type of behavior strikes at the very heart of what the Civil Rights Act of 1964 aims to protect against.

**Her employer failed to keep her complaint confidential, so that extremely sensitive information was made available not only to her harasser, but to the department at large, such that she has been subject to constant taunting and/or harassment by other employees since the time of making the complaint, and additionally has had repeated instances of her pay being unlawfully and arbitrarily withheld.**

As of the date of filing of this supplemental EEOC complaint, Officer Reeves continues to be subject to comments from other male officers regarding the filing of a complaint. Other officers have made statements such as "I'd better be careful around you or you'll file a complaint on me." People at

work have asked Officer Reeves if she was scared to be at work, and told her to watch her back, because "you know what type of people you're dealing with." Officer Reeves has been informed that some officers are angry with her for filing the complaint, and that many male officers are refusing to work around her, professing fear of Officer Reeves filing a complaint against them.

It is also Officer Reeves' understanding that Charles has been representing to other officers that Officer Reeves was motivated by having been jilted by him.  Charles has reportedly told other officers that Officer Reeves pursued him sexually or romantically; that she had repeatedly nagged him to go to the gym with him; and that, on one occasion, she had shown up at his gym and taken a video recording of him while he was working out.  These allegations are false.

In addition to outright hostility from some officers/employees, Officer Reeves has been subject to being ostracized at work, quite possibly because, even assuming the absence of any affirmative animosity, other employees are resistant to being associated with the controversy surrounding Officer Reeves' complaint against Charles.  As a specific example of this, since escalation of the hostility, especially since issuance of the "reprimand," Officer Reeves' supervising sergeant no longer responds to her communications.  He does not answer her phone calls; does not respond to text messages; and does not reply to email communications.  Officer Reeves was previously able to communicate efficiently with her supervising sergeant.

**Her employer has withheld her pay on multiple occasions, causing substantial financial difficulty for her.**

Officer Reeves was not paid on December 1, 2017.  She also did not receive her pay in October 2017.  This withholding of payment of wages has happened previously, and in the previous instance it was also around the same time as Officer Reeves' having filed a complaint.  In the previous instance, it was discovered that an employee had intentionally secreted Officer Reeves' paperwork, to ensure that Officer Reeves was not paid.  Despite that discovery, the employee responsible was never reprimanded.

In October 2017, the payroll personnel informed Officer Reeves that she was not entitled to pay because she had taken leave.  However, Officer Reeves had 25 days of sick leave available to her during the month of October 2017.  The payroll office had merely failed to process the paperwork.  Even after discovering the error, and although the payroll department had been solely responsible for the error, the payroll department refused to rectify the mistake and pay Officer Reeves for the entire month of October.

On December 1, 2017, when Officer Reeves failed to receive her wages, she again spoke with a payroll employee, who nonchalantly told Officer Reeves that it had been another administrative error by payroll, in that they had merely failed to process her paperwork.

When Officer Reeves expressed that she needed her paycheck so that she could meet her financial obligations, the payroll employee dismissed her concerns and told her that she would just have to wait for the next pay cycle, two weeks later.  When Officer Reeves asked about the immediate remedy of cash available on a debit card, or an immediate check, pending the next payroll cycle (both of which Officer Reeves knew had been options to employees at previous times) the payroll employee informed Officer Reeves that "we don't do that anymore."

For her to receive the wages she was owed, Officer Reeves was forced into confrontational and adversarial conversations with people in the payroll department, having to argue to receive money that belongs to her and was being unlawfully withheld.  Because of the withholding of pay, Officer Reeves has suffered financial hardship.  She has been forced to rely on family for help, during periods when her pay has been withheld, to maintain necessities such as electricity.  Officer Reeves has also been unable to make her mortgage payment several times due to the withholding of her pay, which resulted in the institution of foreclosure proceedings.

**On January 23, 2018, she discovered that her employer had reported to her pension plan that she had been terminated, effective in early 2015, and that her employer had failed to make regular payments to her pension plan since that time.**

On January 23, 2018, Officer Reeves contacted her pension plan administrator, to glean some basic information about her retirement plan benefits.  To Officer Reeves' shock and horror, the plan administrator informed her that the NOPD had reported to them that Officer Reeves had been terminated in early 2015.

The administrator further informed Officer Reeves that no contributions had been made to her pension plan since that time, apart from a very few inconsistently intermittent, small deposits.  Officer Reeves never opted out of the pension plan; never authorized the changing of her status with the pension plan administrator; and never received notice of the drastic change to her benefits.

At around the same time that Officer Reeves' employer terminated her pension benefits, Officer Reeves had made a complaint against then-Chief Darryl Albert.  The basis for that complaint involved an incident (separate from the incident described *supra* regarding officers laughing and joking about information contained in Officer Reeves' medical records), in which Albert had disclosed information

from Officer Reeves' medical records to his girlfriend (Albert was married at the time, but had a girlfriend who was also an NOPD employee).  The girlfriend had subsequently passed the information along to at least seven NOPD officers.  Although Albert had clearly violated federal law, Officer Reeves' employer never responded to that complaint in any fashion (other than what now appears to be retaliatory termination of her pension benefits).  Incidentally, Darryl Albert has since been demoted, but due to other improprieties of behavior, not as a result of Officer Reeves' complaint.

Officer Reeves purchased the home in which she currently resides approximately fifteen years ago.  At that time, she had updated her address information with her employer.  However, according to the plan administrator, the address that Officer Reeves' employer had provided to them, and to which address they had continued to send correspondence, was the address of the apartment that Officer Reeves lived in prior to purchasing her home.

Officer Reeves' health has suffered because of the stress and anxiety created by the hostile environment at work.  She suffers from various debilitating symptoms of post-traumatic stress disorder, including persistent migraine headaches and insomnia.  After each incident of harassment by Charles as detailed hereinabove, Officer Reeves was physically sick with anxiety and migraine headaches, such that she had to take sick leave from work.  Sometimes Officer Reeves was physically ill for days at a time.