UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SHANNON REEVES

CIVIL ACTION NO. 19-10766

VERSUS

SECTION "T"
JUDGE GUIDRY

MAGISTRATE DIVISION 5
MAGISTRATE JUDGE NORTH

CITY OF NEW ORLEANS;
RHETT CHARLES; JENERIO SANDERS;
PAUL NOEL;
RANNIE MUSHATT;
WALTER POWERS;
ARLINDA WESTBROOK;
RAYMOND BURKART, SR.;
AND
MICHAEL HARRISON

## PLAINTIFF, SHANNON REEVES', FIRST AMENDED COMPLAINT

This First Amended Complaint is submitted by Shannon Reeves, hereinafter and sometimes referred to as Plaintiff, against City of New Orleans, and individual defendants Rhett Charles; Jenerio Sanders; Paul Noel; Rannie Mushatt; Walter Powers; Arlinda Westbrook; Raymond Burkart, Sr. and Michael Harrison.  This complaint asserts illegal discrimination (sexual harassment; discrimination because of a disability; and retaliation), and the denial of equal protection to a public employee (plaintiff) because of Defendants' deliberate indifference to Plaintiff's federally protected rights.  Plaintiff will show as follows:

### JURISDICTION AND VENUE

1.   Jurisdiction vests with this Court under 28 United States Code sections 1331 (federal question) and 1343 (civil rights); 42 United States Code section 1983; Title VII of the Civil

Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e-2000e-17; and the Americans with Disabilities Act of 1990, as codified, 29 U.S.C. §§ 621-634.

2. Venue lies with this Court; all material matters occurred in Orleans Parish, Louisiana.

3. Plaintiff has exhausted her administrative remedies.

4. Plaintiff filed complaints with the Equal Employment Opportunity Commission (EEOC # 461-2017-01099; 461-2018-02385).  The EEOC mailed right-to-sue letters to the Plaintiff on February 25, 2019.

## I.      PARTIES

5. Plaintiff is a resident of Orleans Parish, Louisiana.

6. Plaintiff's gender is female.

7. Plaintiff was an employee of the City of New Orleans: she was employed by the police department as a peace officer.

8. The New Orleans Police Department is an arm of the City of New Orleans.

9. At all times material to this action, the City of New Orleans was the employer, as that term is defined by law.

10. Defendant Rhett Charles resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Charles was a Sergeant and/or officer with the NOPD.

11. Defendant Jenerio Sanders resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Sanders was a Lieutenant with the NOPD.

12. Defendant Paul Noel resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Noel was a Deputy Chief with the NOPD.

13. Defendant Ranni Mushatt resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Mushatt was Deputy Superintendent of the NOPD's Investigation and Support Bureau.

14. Defendant Walter Powers resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Powers was a Sergeant with the NOPD.

15. Defendant Arlinda Westbrook resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Westbrook was a Deputy Chief with the NOPD (Public Integrity Bureau).

16. Defendant Raymond Burkart, Sr., resides and is domiciled in the State of Louisiana.  At all times relevant to this action, Burkart was a Major with the NOPD.

17. Defendant Michael Harrison resides and is domiciled in the State of Maryland.  At all times relevant to this action, Harrison resided and was domiciled in the State of Louisiana, and was the Superintendent of the NOPD.

## II.      FACTUAL COMPLAINT

### A.  Sexual Harassment

18. On or about November 23, 2016, Plaintiff complained to her employer with respect to conditions of employment.

19. Plaintiff related her complaint to Sergeant Walter Powers, Defendant herein, reporting action by Defendant Rhett Charles, Plaintiff's ranking officer.  Defendant Charles had made the Plaintiff's employment setting intolerable by references to sex, sexual body parts and/or by using demeaning conduct and language.

20. Prior to Defendant Charles' harassment of Plaintiff, Plaintiff had been able to perform her job duties in a satisfactory manner.

21. Defendant Charles' behavior affected Plaintiff's ability to perform her job, and created an intimidating, hostile, and offensive work environment.

22. Plaintiff's complaint was initiated due to a report by Officer Troy Williams on November 22 or 23, 2016.

23. Officer Troy Williams made a complaint against Defendant Rhett Charles for an aggravated battery which Defendant Charles had committed against Officer Williams.

24. While making the complaint, Officer Williams mentioned that Defendant Charles had been sexually harassing females in the unit.

25. Defendant Powers asked Officer Williams who the victims were, and Officer Williams gave Powers Plaintiff's name, along with the name of one other female officer.

26. Prior to November 23, 2016, Defendant Charles had been harassing Plaintiff for several months, on a regular basis.

27. During the first week of February 2016, during the lunch hour, Plaintiff's coworkers had gone to the lunch room and she was alone at her desk   Defendant Charles came and sat down beside Plaintiff.  Defendant Charles instructed Plaintiff that he wished to ask her something.

28. Defendant Charles explained that although he was her ranking officer, she – the Plaintiff – should act, for purposes of his request, as though he were not.

29. Defendant Charles then asked Plaintiff "how fat is your pussy?"

30. Plaintiff told Defendant Charles that she did not wish to engage in the discussion.  This did not deter Charles, who then told Plaintiff, "I like a fat pussy."

31. Rhett Charles then continued to state that he "used to have sex in the bathroom with people all the time" at the Public Integrity Bureau.

32. Defendant Charles' actions in Plaintiff's workplace were unwelcome, invasive and illegal.

33. Defendant Charles then asked Plaintiff what her favorite sexual position was; what was the "freakiest" sexual thing she had ever done; and whether she had ever had sex while on her period.

34. Defendant Charles' comments made Plaintiff feel uncomfortable and trapped, and interfered with her ability to perform her duties and assignments.

35. Defendant Charles then told Plaintiff that he knew Plaintiff lived close to him, and said "I purposely take off during the week while my wife is at work.  So whenever you want to come over let me know, because I just walk around the house naked, and lie in the bed stroking myself."

36. At this point in the conversation, one of Plaintiff's coworkers entered the room, and Defendant Charles hurriedly changed the subject.

37. Later, when Plaintiff was leaving work, Rhett Charles told her loudly from across the room "Shannon, we are going to finish having that conversation."

38. Plaintiff responded "I don't think so."

39. In March 2016, Defendant Charles approached Plaintiff from behind, put his right arm around her, and shook her from the side, looking down her shirt.

40. Plaintiff asked Defendant why he was shaking her, and Defendant Charles responded, "I just wanted to see how my friends were doing."

41. Even though there were periods of time between overt acts of sexual harassment, Defendant Charles also harassed Plaintiff with non-verbal acts, making Plaintiff continuously uncomfortable in the workplace.

42.  In June 2016, Defendant Charles called Plaintiff into his office.  Defendant Charles told Plaintiff, "All I see is titties when I look out my door at you."  Defendant Charles went on to tell Plaintiff that "[i]f we ever have sex, I'm going straight for the titties, I don't have to do nothing else.  I can make you nut just by sucking on your nipples."  Defendant Charles then asked her how big her nipples were, opining that Plaintiff must have big nipples.  When Plaintiff began walking out the door, Rhett Charles said "bye y'all" (referencing Plaintiff's breasts).

43. On or about July 2, 2016, Charles called Plaintiff into his office.  After Plaintiff came in, Charles said "I just wanted to see y'all walk in."

44. This behavior was designed to control and intimidate the Plaintiff; the comments and behavior were based on Plaintiff's gender.

45. Defendant Charles' behavior to Plaintiff, his female subordinate, was pervasive; it was almost a daily occurrence.  Charles' behavior altered the conditions of Plaintiff's employment, creating an abusive working environment.  Defendant Charles' behavior also demanded acceptance or participation as a condition of employment.

46. Multiple women have complained about Defendant Charles' sexually harassing behavior, going back many years.

47. One female officer described Defendant Charles as being "infamous for making inappropriate comments."

48. At least eight (8) women have contacted the Public Integrity Bureau and/or Deputy Chief Arlinda Westbrook to complain of Defendant Charles' behavior.

49. Defendant Westbrook, Deputy Chief of the Public Integrity Bureau, refused to provide names of other complainants to the Plaintiff, fearing a lawsuit.

50. Defendant Westbrook stated that those women's complaints could not be considered, in investigation of Plaintiff's complaint, because none had made official reports.

51. Defendant Westbrook told Plaintiff that all of the previous women had been afraid to file complaints, from fear of retaliation or being "blackballed," like the Plaintiff had been.

52. Some male NOPD employees had also reported to the Public Integrity Bureau that they had witnessed Defendant Charles' harassing behavior.

53. NOPD Sergeant Kenneth Quetant stated that Defendant Charles had been harassing women since being hired by the NOPD, over twenty-five (25) years ago.

54. It is common knowledge in the NOPD that Defendant Charles sexually harasses female employees/officers.

55. NOPD management and supervision were aware of Rhett Charles' behavior prior to Plaintiff's complaint of unwanted workplace, sexual harassment.

56. Defendant Westbrook did little or nothing with the complaints, permitting Defendant Charles to prey on Plaintiff and other females.

57. Women including the Plaintiff have been placed in the untenable position of maintaining silence or of losing their jobs.

58. The following Defendants herein are culpable, under the law, in the context of Defendant Charles' sexual harassment of the Plaintiff, to-wit:

    a.  Defendant Rhett Charles is responsible for his actions against the Plaintiff, as described *supra*;

    b.  Defendant Jenerio Sanders, as Defendant Rhett Charles' ranking officer, knew of Defendant Charles' behavior; failed to properly supervise and/or train Charles;

and/or failed to take action to correct or prevent Charles' unlawful actions.  This includes, but is not necessarily limited to, the following acts or omissions:

    i.   Failure to investigate Plaintiff's complaint;

    ii.   Failure to maintain confidentiality with respect to Plaintiff's complaint;

    iii.   Allowing Defendant Charles to continue to work as Plaintiff's supervisor, after Plaintiff made the complaint, and after Defendant Charles knew about the complaint;

    iv.   Failure to investigate previous complaints of sexual harassment against Defendant Charles;

    v.   Failure to take action to prevent or correct Defendant Charles' constant sexual harassment of other female officers, such as removing Defendant from his supervisory role and/or taking disciplinary action against Defendant Charles.

59. Defendant Paul Noel, as ranking officer for Defendant Jenerio Sanders, was also responsible for supervising Defendant Charles.  Defendant Noel knew of Charles' behavior; failed to properly supervise and/or train Charles; and/or failed to take action to correct or prevent Charles' unlawful actions. This includes, but is not necessarily limited to, the following acts or omissions:

    i.   Failure to investigate Plaintiff's complaint;

    ii.   Failure to maintain confidentiality with respect to Plaintiff's complaint;

    iii.   Allowing Defendant Charles to continue to work as Plaintiff's supervisor, after Plaintiff made the complaint, and after Defendant Charles knew about the complaint;

iv.   Failure to investigate previous complaints of sexual harassment against Defendant Charles;

v.   Failure to take action to prevent or correct Defendant Charles' constant sexual harassment of other female officers, such as removing Defendant from his supervisory role and/or taking disciplinary action against Defendant Charles;

vi.   Participating in the decision to assess a nominal punishment to Defendant Charles (one-day suspension);

vii.   The activities by Plaintiff's supervisors were part of the custom, practice and policies of the Department - and supervisory personnel - not to enforce federal law as related to sexual harassment, which permits "wolves" like Defendant Charles to have the freedom to continue their repeated, persistent, illegal behavior against other public employees.

60. Defendant Walter Powers engaged in conduct to perpetuate and protect the illegal conduct of Charles.  Powers contacted Plaintiff on November 23, 2016, under the guise of investigating Defendant Charles' behavior.  Within the following week, Powers had informed Defendant Charles of everything that the Plaintiff had reported. This activity by Charles was part of the Defendant's custom and policies in existence at the time, which Defendant was aware of.   Powers' failure to maintain confidentiality severely compromised the investigation, and facilitated Charles' ongoing unlawful behavior.  For example, Defendant Charles knew of the audio recording (made by the Plaintiff to capture some of Defendant Charles' statements).  Had Defendant Charles not been made aware of the contents of that recording, he may have denied having made the statements,

which would have been a terminable offense.   Instead, Charles was able to craft a response ahead of time, attributing his comments to a joking group conversation.

61. Defendant Arlinda Westbrook, Deputy Chief of NOPD's Public Integrity Bureau (PIB), simply failed to do her job, in violation of federal law, in the following respects.

    i. Defendant Westbrook worked against the Plaintiff in the complaint process.   Defendant Westbrook failed to reassign Defendant Charles, after receiving Plaintiff's complaint;

    ii. Plaintiff was forced to continue working under Charles, until Westbrook was contacted by the Independent Police Monitor.

    iii. On or about August 1, 2017, Westbrook told Plaintiff that her complaint against Charles was not valid, and that the complaints of many other women could not be considered;

    iv. Westbrook also told Plaintiff that Defendant Charles had no history of sexual harassment and nothing could be done about her complaint;

    v. The news media reported Westbrook asserted Plaintiff never did file a complaint and thus there was nothing to investigate;

    vi. Despite the long history of complaints against Defendant Charles for sexual harassment, Westbrook failed to do anything toward implementing a policy of sexual harassment.   Such a policy could have protected the victims (for example, by mandating confidentiality and prohibiting all forms of retaliation);

vii.  Compounding the problem, Westbrook adopted the position that, because no such policy existed, nothing could be done about Plaintiff's victimization;[1]

viii.  Westbrook's stance is in violation of long-standing federal law;

ix.  Although many of Defendant Charles' victims had complained to Defendant Westbrook, she failed to take any action to protect them. Westbrook did nothing to address, correct, or prevent Defendant Charles' illegal actions, tacitly condoning the continued victimization of female officers;

x.  Defendant Westbrook was a member of the three-person panel designated to address the complaint against Defendant Charles, and participated in the decision to impose a one-day suspension.

62.  Christopher Johnson was assigned by the NOPD's PIB to investigate the complaint, during the first week of December 2016. Although Johnson has been removed as an individual Defendant, Johnson engaged in conduct during the course of his employment which protected the then-policies and procedures of the Defendant City of New Orleans.

63.  The City did not adopt a complete sexual harassment policy until May 7, 2017.

64.  When a sexual harassment complaint was "filed" by an employee and/or sexual harassment was brought to a supervisors' attention (there was no generally known procedure for submission of a complaint) the complaint was classified as "Neglect of Duty" or other catch-all phrases.

---

[1] On May 7, 2017, the NOPD adopted a policy prohibiting Workplace Discrimination, Sexual Harassment, and Retaliation.  The policy provides for punishment up to and including termination, but was implemented too late to protect the Plaintiff.

11

65. This policy and procedure permitted the City of New Orleans and its agents and assigns to conceal sexual harassment complaints, and not count/keep a record of complaints against its officers, thus protecting illegal conduct.

66. "Neglect of Duty" also applies to actions such as failure to iron one's uniform, or submit typed reports in a timely fashion; the maximum penalty for "Neglect of Duty" was three days' suspension.

67. Investigator Johnson failed to take immediate action to protect the Plaintiff during the complaint process.

68. Investigator Johnson failed to reassign Defendant Charles.  Defendant Charles was not reassigned until Plaintiff wrote a letter complaining to a third party about not being protected.

69. Defendant Rannie Mushatt was Deputy Superintendent of the Investigative and Support Division (position previously occupied by Darryl A. Albert) in the police department.

70. Mushatt assumed the position after Albert was demoted (after Plaintiff and others complained of his sexual harassment).

71. Mushatt's conduct complained of herein was in the course and scope of his employment as an supervisory officer for the police department.

72. After Plaintiff's complaint was brought to Mushatt's attention, Mushatt failed to investigate Plaintiff's complaint.

73. Mushatt failed to maintain confidentiality with respect to Plaintiff's complaint.

74. Mushatt allowed Defendant Charles to continue to work as Plaintiff's supervisor, after Plaintiff made the complaint, and after Defendant Charles knew about the complaint.

75. Defendant Mushatt failed to investigate the previous complaints of sexual harassment against Defendant Charles, even though Defendant's Charles' conduct was open and obvious and common knowledge in the Department; this failure was consistent with the City's custom, policies, and procedures.

76. Defendant Mushatt failed to take action to prevent or correct Defendant Charles' constant sexual harassment of other female officers, such as removing Defendant from his supervisory role and/or taking disciplinary action against Defendant Charles; this failure was consistent with the City's custom, policies, and procedures.

77. Defendant Mushatt participated in the decision assess a nominal punishment to Defendant Charles (one-day suspension), with Defendant's pay remaining the same, even though his sergeant stripes were supposedly removed.

78. The above punishment was a ruse and was pretextual in nature.  Charles had at least eight (8) other complaints of sexual harassment lodged against him, and his conduct was readily known by other female and male officers in the department; this disregard for the constitutional rights of Defendant Charles' victims was consistent with the City's custom, policies and procedures..

79. Defendant Michael Harrison was the Superintendent of Police for the entire department and was the policy maker for the department at the time.

80. Defendant Harrison, during his service to the Department, failed to change the policies prior to their harm to Plaintiff and violation of her constitutional rights.

81. Defendant Harrison enforced the custom, policies and procedures complained about herein, affecting Plaintiff and others.

82. Defendant Harrison failed to enact policies reflecting the clearly recognized law against sexual harassment in the workplace; failed to enact and implement a sexual harassment policy for the City of New Orleans; and therefore "blessed" the policy permitting the concealment of sexual harassment complaints.

83.  On March 16, 2011, the United States Department of Justice's Civil Rights Division issued a report surrounding the Investigation of the New Orleans Police Department.

84. Page 74 of the Justice Department's report contains the correct assessment that an officer's off-duty detail is a privilege and not a right.

85. After his "punishment" for "Neglect of Duty," Defendant Charles, even though pretextually punished, continued on the same security details (privileges) as he did prior to the supposed demotion, including working as an on-duty officer at the New Orleans Saints games.

86. Page 77 of the Department of Justice's report contains the correct assessment that the Police Department had the authority and ability to enact and regulate their own policies and procedures. Superintendent Harrison's disregard of federally protected rights with regard to sexual harassment, and failure to enact and implement a sexual harassment policy for the department, does not pass muster in light of the Department of Justice's (DOJ) [Civil Rights Division] findings.

87. DOJ placed the City on notice (knew or should have known, conscious indifference) by explaining that the NOPD's policies and procedures created a circumstance whereby misconduct is encouraged, ensuring that highly capable and ethical officers are not promoted, and creating an inability to address the systemic deficiencies which may contribute to the pattern of misconduct.  *Id*. at 78.

88. DOJ also found: NOPD's promotion policy ostensibly takes into account an officer's disciplinary history. However, NOPD's complaint investigation renders this consideration ineffective. Many complaints are not formally investigated when they should be; investigations are not sustained when they should be, and sustained cases do not result in the disciplinary they should. Current NOPD policy further undermines adequate consideration of an officer's disciplinary history. *Id.*

89. On July 24, 2012, the United States of America and the City of New Orleans entered a Consent Decree Regarding the New Orleans Police Department, in Case Number 12-1924 [Sect. E – Mag. 2].

90. The Consent Decree addressed the disciplinary issues endemic in the NOPD [*id*. at page 104, ¶422]: "NOPD agreed to use a disciplinary matrix for its officers and to include the following:  a) establish a presumptive range of discipline for each type of rule violation; b) increase the presumptive discipline based on an officer's prior violations of the same or other rules; c) set out defined mitigating or aggravating factors; d) requires that any department from the presumptive range of discipline must be justified in writing;
e) provides that NOPD shall not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline and f) provides that NOPD shall consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed."

91. In Defendant Rhett Charles' case the City avoids the agreement by: i) failure to report and failure to document complaints of eight or more women who reported his conduct;

ii) failure to investigate even when the victims grew fearful of reporting; iii) failure to institute a formal sexual harassment policy to protest clearly illegal conduct, permitting "wolves" like Charles to flourish.

92. Prior to the enactment of a sexual harassment policy, the custom, practice and policy of the NOPD was to not label a sexual harassment complaint as a sexual harassment complaint.

93. By way of example, in 2016, 40% of all complaints with the Public Integrity Division were categorized as "Neglect of Duty", as reported by the Times-Picayune, July 12, 2017.  The source of this data was the Independent Police Monitor's Report established by the Consent Decree.

94. The Times-Picayune reported: "Of the 729 "Neglect of Duty" allegations made in 2016, 247 of the complaints were for violations of policy, which includes the department's sexual harassment policies.  The report does not detail how many of those involved allegations of sexual harassment."

95. Charles' harassment of Plaintiff was classified as "Neglect of Duty."

96. Even though commentary comments recognized that Charles' common practice was to engage in sexual harassment of female employees, these previous complaints were also characterized as "Neglect of Duty," and thereby subject to the same practice and policy of concealment – avoiding tracking of this information and the history and pattern of victimization, creating an appearance that Plaintiff's complaint was the first complaint entered against Defendant Charles.

97. Defendant Charles' punishment was administered under a "Neglect of Duty" disciplinary matrix.

98. The tie-in to notice for the Department is clear from the Justice Department's findings: "We found that NOPD's policies and practices exclude from investigation many categories of serious officer misconduct …" (Investigative Findings at 79).

## B. Americans With Disabilities Act

99. Plaintiff suffers from Post-Traumatic Stress Disorder; depression; and anxiety.

100. Plaintiff also suffers from migraine headaches, which can be triggered by fluorescent lights (Plaintiff has been diagnosed with epilepsy since filing of the EEOC complaint).

101. Plaintiff's migraine headaches are severe and debilitating.  Absent accommodation, they substantially limited her abilities to perform the duties of her job on a sustained basis. When suffering a migraine, Plaintiff would often be required to lie down in a darkened room for an extended period.

102. On July 13, 2015, a counselor treating Plaintiff wrote a letter requesting accommodations for Plaintiff's anxiety and depression, suggesting that Plaintiff would be best suited to a job involving low stress, consistent hours, and consistent working conditions.

103. Plaintiff provided a copy of this letter to her employer; the request was ignored.

104. NOPD could easily have accommodated the Plaintiff in this regard.  Several NOPD employees are assigned to such positions because of disability and/or limited-duty status; many such employees have held these positions for years.  Appropriate positions were available; one of them is described in paragraphs 112-113, *infra.*

105. On or about September 24, 2015, Plaintiff's treating neurologist wrote a letter advising the employer the Plaintiff was restricted from working under fluorescent lights due to her condition.

106. Plaintiff subsequently provided a copy of the letter to Deputy Chief Stephanie

Landry, during a Rule 9 hearing.

107. Stephanie Landry became angry; refused to read the letter; pushed it

back over the table to the Plaintiff, and abruptly terminated the meeting.

108. Plaintiff continued to urge the request to modify the lighting in Plaintiff's work

area.

109. Although the accommodations for this restriction would have been as simple as

replacing the light fixtures in Plaintiff's working area, NOPD ignored the request, telling

the Plaintiff that it would not be possible to accommodate her.

110. Captain Ernest Demma attempted to assist the Plaintiff, repeatedly requesting that

Plaintiff be accommodated with respect to lighting.

111. Captain Demma's requests on Plaintiff's behalf were repeatedly denied by

Defendant Stephanie Landry and/or by Defendant Raymond Burkart, Sr.  Captain

Demma was instructed not to accommodate Plaintiff.

112. Despite the insistence of impossibility of the requested accommodation, in late

2016, Plaintiff was moved to an administrative position with Chris Abbott.  Abbott's

office was in the basement, and was relatively isolated.  The position involved processing

paperwork.  Abbott also suffered from migraines, and his work space was lit with a lamp,

rather than fluorescent lighting.

113. Plaintiff thrived in this environment, which provided the conditions that she

needed.  During the two months Plaintiff worked with Abbott, she did not miss any work.

114. NOPD did not allow Plaintiff to remain in that position, transferring her in late

February, 2017.

115. Plaintiff was transferred to the front desk at NOPD headquarters, where her

workspace was replete with fluorescent lighting.  Tangentially, Plaintiff was not permitted to have a weapon at the front desk.  This is a violation of NOPD's own policy, which requires front-desk employees to be armed, for their own safety.

116. During her time in this position, Plaintiff initiated a conversation with NOPD Superintendent Michael Harrison, telling him about her migraines, continuous requests for accommodation, and the NOPD's continued refusal to address the issues.

117. Defendant Harrison was dismissive of the Plaintiff, telling her to take it up with her chain of command.

118. Plaintiff's health has suffered because of the stress and anxiety created by the hostile work environment.

119. Post-traumatic stress disorder and migraine headaches are conditions which, when they substantially limit major life activities, qualify as disabilities under the Americans with Disabilities Act.  42 U.S.C. § 12102;  *Cooper v. UPS*, No. 08-1583, 2008 U.S. Dist. LEXIS 88649 (E.D. La. 2008).

120. With the reasonable accommodation of adjustment of lighting, Plaintiff could perform the essential functions of her job.  This was demonstrated by the Plaintiff's time working with Chris Abbott.

121. The NOPD refused to provide reasonable accommodations to the Plaintiff; instead, the NOPD subjected the Plaintiff to multiple Rule 9 hearings.

122. The NOPD terminated Plaintiff's employment on May 22, 2018, citing Plaintiff's inability to perform her job duties, for medical reasons.

**C. Sexual Discrimination and ADA Employment Discrimination**

123. The complained-of discrimination represents illegal acts in violation of both Title

VII (sexual discrimination) and ADA violation, in the additional continued following respects:

i.   Stephanie Landry, then Deputy Chief of the NOPD's Management Services Bureau, reacted with hostility to Plaintiff's request for accommodation;

ii.  Landry refused to read the letter from Plaintiff's neurologist (regarding fluorescent lighting);

iii. Landry specifically directed NOPD employees not to provide accommodations to the Plaintiff.  Landry frequently transferred the Plaintiff to new positions;

iv.  When Plaintiff was placed in a position where accommodations were available, Landry removed the Plaintiff from the position after two months;

v.   Defendant Michael Harrison, NOPD Superintendent, failed to properly supervise and/or train his subordinates.  Defendant Harrison knew that Plaintiff was suffering, as a result of the NOPD's failure to provide reasonable accommodations;

vi.  The Department supervisors and investigators attempted to suppress the complaints of sexual harassment complaints directed against her by supervisory personnel;

vii. Defendant Harrison knew that Plaintiff was not getting any relief from her chain of command, prompting her conversation with him, yet he refused or failed to do any investigation or assist the Plaintiff in any way;

    viii.  Defendant Harrison also approved Plaintiff's termination;

    ix.  Defendant Raymond Burkart, Sr. was a Major with the NOPD's Administrative Duty Division (ADD), which is responsible for working with employees who have disabilities.

    x.  Defendant Burkart took over the ADD sometime around September 2017. Shortly thereafter, Plaintiff discovered Defendant Burkart reading HIPAA-protected information from Plaintiff's medical records to Sergeant Quetant and another NOPD employee.  All three were laughing. Defendant Burkart worked to penalize the Plaintiff for requesting accommodations;

    xi.  Defendant Burkart told the Plaintiff that he was going to make sure that she got fired, because of her medical conditions.

**D.  Retaliation**

124. Plaintiff was retaliated against for engaging in protected activity (making a complaint of sexual harassment, denial of equal protection and for requesting accommodation under the ADA).

125. Plaintiff made her initial complaint on or about the 23rd day of November 2016, to Sergeant Walter Powers.

126. At the time of Plaintiff's complaint under paragraph 126 above, the Plaintiff was not aware of any policy or procedure that her employer had in place regarding sexual harassment.

127. With regard to the previous paragraph, any policy(ies) and procedure(s) were not distributed to employees and/or employees were not made aware of it/them, which had the practical effect of no policy at all.

128. At the time of Plaintiff's November 2016 complaint, Defendant Powers called Plaintiff, who was at home.  Defendant Powers asked whether he could come to Plaintiff's home that evening to take her report.

129. Plaintiff informed that she did not feel comfortable giving her statement at home, given the topic and the fact that she lived alone.  Defendant Powers informed that he would contact NOPD's Public Integrity Board (PIB) and would call Plaintiff right back to take a statement from her.

130. Defendant Powers solicited sensitive information from Plaintiff, ostensibly to take a complaint, but never contacted Plaintiff again regarding her complaint.

131. Within a few days of Plaintiff's report to Defendant Powers, Plaintiff witnessed Defendant Powers and Defendant Charles having a conversation in Charles' office. When Powers noticed the Plaintiff outside, he closed Charles' office door.

132. Around the same time, NOPD Sergeant Kenneth Quetant informed the Plaintiff that Defendant Charles, and many others in the Police Department, were aware of the specific details of Plaintiff's complaint, including the audio recording.

133. On or about December 1, 2016, Plaintiff contacted Ms. Ursula Price, at the New Orleans Independent Police Monitor, to report the harassment.

134. Plaintiff explained to Ms. Price that Defendant Charles had been informed of Plaintiff's complaint.  Plaintiff also explained that she was afraid to make a complaint to PIB, as she was afraid of retaliation, due to her previous experience with PIB.

135. However, Ms. Price subsequently contacted the PIB, who assigned Sergeant Christopher Johnson to investigate.

136. On or about December 6, 2016, Defendant Johnson spoke with each employee

assigned to Plaintiff's shift (morning watch).

137. It is Plaintiff's understanding that, during that initial meeting with Investigator

Johnson on December 6, 2016, several other employees reported either having witnessed

or experienced sexual harassment by Defendant Charles.

138. On December 7, 2016, Plaintiff sent an audio recording of some of Defendant

Charles' statements to Investigator Johnson via email.

139. After speaking with Investigator Johnson briefly on December 6, 2016, and

sending him the email on December 7, Plaintiff did not hear from Investigator Johnson

again regarding investigation of the complaint.

140. Plaintiff was never formally interviewed about the incidents of sexual harassment.

141. Plaintiff was never permitted to give a formal written statement about the incidents of

sexual harassment.

142. Plaintiff called Johnson several times to inquire as to the status of the investigation; each

time, he told her that he had a lot of cases to handle, and had not gotten to it yet, and that

he was handling it as "an independent incident."

143. Plaintiff wrote her own statement, and requested a meeting with PIB Chief Westbrook.

Defendant Westbrook informed Plaintiff that there was not really anything that the

NOPD could do about Defendant Charles' behavior, as the NOPD did not have a policy

specifically prohibiting sexual harassment in place.

144. Westbrook also told Plaintiff that the NOPD could not do anything because Officer Troy

Williams, rather than the Plaintiff, had initiated the report.

145. The problem (lack of a sexual harassment policy) had been noted by the Independent

Police Monitor's office in 2015, according to its director, Ursula Price.

146. Ms. Price also noted that the NOPD's system, with regard to Plaintiff's complaint, was set up to make Plaintiff (the victim) carry the burden of proof, and that it did not provide safety for complainants.

147. Plaintiff's employer took a year to investigate Plaintiff's complaint. This delay was retaliatory in and of itself, especially given the fact that Plaintiff continued to be subjected to daily hostility throughout.

148. After each incident of harassment by Defendant Charles as detailed hereinabove, Plaintiff was physically sick with anxiety and migraine headaches. Plaintiff had to take sick leave from work, and was sometimes physically ill for days at a time. Plaintiff has since been diagnosed with epilepsy, brought on by stress.

149. During the first month and a half of the investigation, her employer failed to take any action to protect her; Plaintiff was still forced to work each day under Defendant Charles.

150. During the week following Plaintiff's complaint, NOPD Sergeant Kenneth Quetant told Plaintiff that Defendant Charles knew the details of Plaintiff's complaint, including that Plaintiff had an audio recording.

151. As further evidence of Charles' knowledge, in December 2016, at a Christmas party, Defendant Charles bragged about the complaint. Charles told a female NOPD employee: "You know that big-chested girl Shannon that works in APR? She has a sexual harassment complaint against me."

152. After a month and a half of working under Defendant Charles' daily supervision, Plaintiff spoke with Cecile Tabo. Ms. Tabo is a Licensed Clinical Social Worker with NOPD's Officer Assistance Program/Medical and Social Services. While Plaintiff was

in Tabo's office, Tabo called Susan Hutson, with the New Orleans Independent Police

Monitor.  Ms. Hutson subsequently made contact with Arlinda Westbrook.

153. Within a few days after Plaintiff reached out to Tabo for help, her employer

finally transferred Defendant Charles, so that Plaintiff was no longer subject to his

authority each day.

154. Defendant Charles' transfer was a pretext, as described further below.

155. On August 1, 2017, Plaintiff met with Defendant Westbrook, Defendant Johnson,

Ursula Price, and Cecile Tebo.  The meeting had apparently been prompted by an article

published in the Times-Picayune on July 12, 2017.  Plaintiff was not named in the

article, but Westbrook stated that she had been. Westbrook told Plaintiff that they were

not investigating her case because her complaint was merely part of another case in

which Plaintiff's name had been mentioned.  Defendant Westbrook said that Defendant

Charles had no history of sexual harassment and that no other victims had come forward,

which Plaintiff knew to be false.  Apparently, Defendant Westbrook meant that Charles

had no documented disciplinary history for sexual harassment, since clearly many

women had complained about his behavior.

156.  In November 2017, Defendant Charles received a one-day suspension as a

reprimand for sexually harassing the Plaintiff, again, because it was "neglect of

duty".

157. Defendant Charles was also demoted from the rank of Sergeant to Police Officer.

Defendant Charles' salary was not reduced.

158. The three members of the panel who decided on Defendant Charles' reprimand

were Chief Arlinda Westbrook (Defendant herein); Chief Paul Noel (Defendant

herein); and Chief Ranni Mushatt (Defendant herein).   Rannie Mushatt and Rhett Charles are close friends.

159. After making the complaint in 2016, Plaintiff experienced hostility at work, including constant taunting and harassment by other employees.

160. After issuance of the "reprimand," Sergeant Kenneth Quetant stopped speaking to the Plaintiff.  Quetant did not answer her phone calls; did not respond to text messages; and did not reply to email communications.  Plaintiff had previously been easily able to communicate with Quetant, who had been the one to tell her about the breach in confidentiality.

161. On Friday, July 21, 2017, Officer Caroline Dalton and Officer Angel Clemons, both of whom were close in proximity to the Plaintiff, started loudly speaking about making complaints.  The two officers were saying "I'm tired of these messy hos and bitches around here.  If they too messy and if they need to say something to me they need to say it."

162. The following Monday, July 24, 2017, one of Plaintiff's co-workers asked the two female officers what all of the "screaming" on Friday had been about.  The women both said loudly "no we don't have a problem with you!"  Plaintiff then walked over and asked whether the officers had a problem with Plaintiff.  Both women started speaking to the Plaintiff in loud and hostile voices; Officer Clemons said "yes, we have a problem with you."  Officer Clemons then stated that Plaintiff was "messy" and was getting people in trouble.  Officer Dalton stated "I'm glad you put your big girl shoes on and came over here.  I have a problem with you being messy and gossiping."  When Plaintiff asked Dalton what she was talking about, Dalton said "you around here recording people."

Officer Clemons later told the Plaintiff that she wanted to make a report to PIB regarding Defendant Charles' harassment toward Clemons personally, but was afraid for Officer Dalton to know.

163. Plaintiff was continuously subjected to comments from other male officers regarding the filing of a complaint.  Other officers made statements such as "I'd better be careful around you or you'll file a complaint on me."  These kinds of comments are impermissible; they are directed toward Plaintiff's exercise of her civil rights.

164. Plaintiff was told to watch her back, because "you know what type of people you're dealing with."

165. Plaintiff was informed that some officers were angry with her for filing the complaint, and that many male officers refused to work around her, professing fear of Plaintiff filing a complaint against them.

166. Plaintiff's employer failed to keep her complaint confidential, so that extremely sensitive information was made available not only to her harasser, but to the department at large.

167. The employer also failed to protect her private medical information.  Plaintiff was ridiculed by other employees because of information in her protected medical records.  In the latter part of 2017, prior to a Rule 9 hearing, Plaintiff walked into Defendant Raymond Burkart, Jr.'s office.  Plaintiff found Defendant Burkart reading aloud from Plaintiff's medical records.  Burkart was reading to Sergeant Quetant and another NOPD employee.  All three were laughing riotously and commenting on the information.  Neither Quetant nor the other employee was involved in the Rule 9 hearing in any way, and there was no reason for either to have access to Plaintiff's protected

information.  Not only had Plaintiff's information been disclosed, it was being ridiculed; this was clearly retaliatory.

168. Defendant Charles was, and continues to be, unrepentant.  Defendant Charles has represented to other officers that Plaintiff's complaint was motivated by having been jilted by him, that Plaintiff pursued him sexually and/or romantically and that she had repeatedly nagged him to go to the gym with her.  Defendant Charles also stated that Plaintiff had shown up at his gym and taken a video recording of him while he was working out.  These allegations are false.

169. After being reprimanded for sexual harassment in November 2017, Defendant Charles continued to violate NOPD policy with impunity.  For example, over ten of Charles' postings on Facebook, during hours when he was at work, were of an obscene and/or sexually explicit nature.  Plaintiff brought this to PIB's attention.  PIB found the postings to be inconsequential.

170. Defendant Charles continues to work in positions of public trust, representing the NOPD.  For example, he regularly assists with security at Saints games.

171. Plaintiff was terminated on or about May 23, 2018; Plaintiff received notice of her termination on or about June 8, 2018.

172. The purported reason for the termination:  unable or unwilling to perform the duties of her position in a satisfactory manner.

173. Plaintiff was terminated under a disciplinary rule.

174. Plaintiff was notified of an action being brought against her by a Rule 9 letter signed by Defendant.

175. Plaintiff was subjected several Rule 9 hearings after the date of her filing

of the EEOC complaint.

176. The stated reason for Plaintiff's termination was false and pretextual.

177. Plaintiff's termination was a result of her attempts to enforce her federally

protected rights.

178. After Plaintiff was terminated, Defendant Charles made a post on Facebook,

referring to his feeling of vindication upon Plaintiff's termination.

179. Plaintiff was transferred to several different positions after she made the complaint;

Plaintiff was generally transferred every month or two.

180. When Plaintiff was actually assigned to a position that afforded the necessary

accommodations, she was not permitted to stay in the position.  Plaintiff was transferred

after two months, to the front desk at NOPD Headquarters.  Plaintiff's health (due to

many overhead fluorescent lights) and physical safety (due to her inability to carry a

weapon) were both placed at risk.

181. Plaintiff's employer withheld her pay on multiple occasions, causing substantial

financial difficulty for her.  This withholding of payment of wages happened around the

times that Plaintiff had filed complaints.  In order to receive the wages she was owed,

Plaintiff was forced into adversarial conversations with the payroll department.  Plaintiff

spoke several times with Kim Palmer, currently head of the NOPD's payroll department.

According to witnesses, Palmer concealed Plaintiff's payroll paperwork in the bottom of

a desk drawer, so that Plaintiff would not be paid.

182. On January 23, 2018, Plaintiff discovered that her employer had reported to her

pension plan that she had been terminated from her job.  No payments had been made to

her pension since early 2015.

183. At around the same time that Plaintiff's employer terminated her pension benefits, Plaintiff had made a complaint against then-Chief, Darryl Albert. The basis for that complaint involved an incident in which Chief Darryl Albert had disclosed Plaintiff's confidential medical information to his girlfriend, Angelie Harris.

184. Albert's girlfriend, an NOPD employee, then disclosed the information to at least seven (7) other NOPD employees, subjecting Plaintiff to ridicule and embarrassment. Albert told other employees that Plaintiff was crazy, and that anyone working with the Plaintiff should keep their guns close at hand. Plaintiff had complained about this incident to PIB, but no investigation had been conducted, and the complaint had not been kept confidential.

185. Although Albert had clearly violated federal law, Plaintiff's employer never responded to that complaint in any fashion (other than what now appears to be retaliatory termination of her pension benefits).

186. Just prior to Plaintiff submitting the complaint against Albert, Albert gave a directive for Plaintiff's weapon to be taken from her. Sergeant Omar Diaz with PIB came to carry out Albert's order on March 28, 2014. Diaz told Plaintiff that, if she filed a complaint against Albert, she would be fired, saying "you already have a target on your back."

187. The employer terminated her employment, due in part to her complaint of sexual harassment, but also due to her medical condition and restrictions that her employer refused to accommodate.

188. All named Defendants herein have participated in condoning or failing to take

appropriate actions to address the actions taken against the Plaintiff as hereinabove described.

### E. CUSTOM, PRACTICE AND PROCEDURE IN VIOLATION OF FEDERALLY PROTECTED RIGHTS

189. Based upon the facts asserted in paragraphs 19-96, Plaintiff asserts and affirms as follows:

    i. Sexual harassment in public employment violates the Equal Protection Clause;

    ii. The governmental entity knew or should have known of the offending acts (sexual harassment) and failed to act;

    iii. Official policymakers had actual or constructive knowledge of "a persistent, widespread practice of governmental officials or employees, which, although not authorized by official adopted and promulgated policy, is so common and well-settled as to constitute a custom;"

    iv. Defendants herein were deliberately indifferent to federally protected rights; "a direct causal link between the municipal policy and the constitutional deprivation" existed herein; the City of New Orleans' policy was a "moving force" behind the violation;

    v. Defendant City of New Orleans' policy of concealment of complaints worked to deprive Plaintiff of her protected rights;

    vi. Defendant City of New Orleans' policy, practice and custom disregarded well-established law with regard to sexual harassment; the absence of a sexual harassment policy worked to deprive Plaintiff of her protected rights;

vii. Defendant City of New Orleans' policy, practice and custom of not investigating sexual harassment complaints worked to deprive Plaintiff of her protected right to equal protection under the law.

## III.   PRAYER FOR RELIEF

Plaintiff prays for the following relief:

190. Declaratory judgment stating that the Defendants have engaged in discriminatory conduct and sexual harassment, and have violated federal and state law in violation of Title VII;

191. Defendants' conduct violated Plaintiff's federal protected rights to equal protection as a public employee; and as such each Defendant is liable under 42 United States Code Section 1983;

192. Back wages and benefits;

193. Future wages and benefits;

194. Compensatory damages for harm incurred in the past, present and future;

195. Medical bills in the past, present and future;

196. Exemplary damages against the individual defendants;

197. Reasonable and necessary attorney's fees, if and when Plaintiff is the prevailing party;

198. Pre-judgment and post-judgment interest;

199. Costs of court;

200. Plaintiff also prays for all relief in equity and under law to which she may be deemed entitled.

DATE:  January 9, 2019.

Respectfully submitted,

/s/ Ellyn J. Clevenger

_____

Ellyn J. Clevenger (#32395)
Wendy Manard (#29622)
Energy Centre: 1100 Poydras Street
Suite 2610
New Orleans, Louisiana 70163
Telephone: (504) 585-7777
Facsimile: (504) 556-2977

ATTORNEYS FOR THE PLAINTIFF
SHANNON REEVES

A JURY TRIAL IS DEMANDED

CERTIFICATE OF SERVICE

This is to certify that on this the 9th day of January, 2020, the foregoing Plaintiff's First

Amended Complaint was filed electronically and a copy of the pleadings was forwarded to the

opposing counsel(s) in accordance with Rule 5, to-wit:

Kim M. Boyle
Brandon E. Davis
Rebecca Sha
Phelps Dunbar LLP
365 Canal Street, Suite 2000
New Orleans, Louisiana  70130-6534
boylek@phelps.com

Eric J. Hessler
Hessler Law
2802 Tulane Avenue
New Orleans, Louisiana 70119

Chester Theodore Alpaugh, III
Guste, Barnett, Schlesinger, Henderson & Alpaugh
694 Loyola Avenue
Suite 2130
New Orleans, Louisiana 70113-7103
cta@gustebarnett.com

/s/ Ellyn J. Clevenger

_____

Ellyn J. Clevenger (#32395)